BOWMAN, Jerry

v.

WILSON, Lieutenant Scott E., Brig Officer, Naval Confinement Facility Philadelphia Naval Yard.

Appeal of Lieutenant Scott E. WILSON.

No. 81–1754.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1981.

Decided Feb. 8, 1982.

As Amended May 12, 1982.

---

11. Transcript at 11.

W. Gary Kohlman, Andrew L. Lipps, Public Defender Service, Washington, D. C., Aaron Beyer, Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal by Lieutenant Scott E. Wilson, Brig Officer of the Naval Confinement Facility, Philadelphia Naval Yard, raises important questions concerning the exercise of judicial authority in granting a writ of habeas corpus at the instance of a military prisoner under court-martial. The United States District Court for the Eastern District of Pennsylvania granted the writ, 514 F.Supp. 403 directing the military to produce Private Jerry Bowman at a mental competency hearing to be held before Judge Samuel E. Block of the Superior Court of the District of Columbia, and stayed pending military court-martial proceedings of Bowman.[1] Bowman claims that the Army wrongfully removed him from the jurisdiction of the Superior Court. He seeks return to the custody of the District of Columbia and the enjoinder of the court-martial proceedings pending at Fort Dix, New Jersey. We reverse the grant of habeas relief and vacate the order staying court-martial proceedings.

### I.

Bowman, a private in the United States Army assigned to Fort Dix, New Jersey, was charged and referred for trial by General Court-Martial on September 17, 1979, for two violations of 10 U.S.C. § 925 (forcible sodomy), three violations of 10 U.S.C. § 886 (absence without leave), and one vio-

Peter F. Viara, Jr., U.S. Atty., Philadelphia, Pa., Stuart E. Schiffer, Acting Asst. Atty. Gen., Anthony J. Steinmeyer, Frederick Geilfuss, Civil Division, Dept. of Justice, Washington, D. C., for appellant.

1. On May 21, 1981, pending resolution of this appeal, we modified the district court order and directed (1) that Bowman remain in the custody of the United States Army until further order of this court, (2) that he be made available for a mental competency hearing before Judge Block, and (3) that the stay of all court-martial proceedings against him be continued until further order of this court. Pursuant to our order, the Military retained custody of Bowman during the hearing. Upon completion of the hearing in the Superior Court, the Army returned Bowman to the Philadelphia Navy Yard brig where he is now confined. *See* note 2 *infra*.

lation of 10 U.S.C. § 934 (general disorder—communicating a threat to injure). On the eve of his court-martial Bowman escaped from the physical custody of the Military.[2] On March 12, 1980, he was arrested in Washington, D.C., and subsequently indicted for first degree burglary, assault, and destruction of property. Following notification that Bowman was in police custody in the District of Columbia, the Armed Forces on March 16, 1980, lodged a military detainer for him with the District of Columbia Detention Facility.[3] Although Bowman was found to be mentally competent to stand trial, on September 3, 1980, Judge Block, on the basis of a stipulation found Bowman not guilty of all charges by reason of insanity, finding him suffering from a psychosis which was likely alcohol induced. Pursuant to D.C.Code § 24–301(d), which mandates a defendant's commitment to a psychiatric hospital after acquittal of criminal charges by reason of insanity, the court committed Bowman to Saint Elizabeth's Hospital in Washington, D.C., for treatment. Two months later, on November 6, 1980, pursuant to the court's order, he was conditionally released from inpatient treatment at Saint Elizabeth's subject to his compliance with an outpatient treatment plan.[4] At the time that he ordered the conditional release, Judge Block was unaware of the outstanding court-martial charges against Bowman.

In December 1980, through a check of the Superior Court's data files, the military police learned of Bowman's acquittal by reason of insanity and his commitment to Saint Elizabeth's. When the military police contacted the hospital, they learned that Bowman was no longer an inpatient but was reporting to the hospital once a week. Without knowledge of Judge Block's conditional release order but with the consent of the Director of Forensic Programs at Saint Elizabeth's, the military police took Bowman into custody when he reported to the hospital on December 18, 1980. Since they were unaware of the Superior Court's order, the military police did not seek authorization from or notify the court. Bowman was returned to Fort Dix and then again transferred to the Naval Confinement Facility of the Philadelphia Naval Yard pending the resumption of the court-martial proceedings.

Bowman was subsequently charged with violation of 10 U.S.C. §§ 885 (desertion) and 895 (escape from confinement). A trial date for these and the earlier charges was set for February 17, 1981, postponed until April 22, and then postponed indefinitely pending resolution of the jurisdictional dispute which ensued. The court-martial proceedings remain stayed by order of this court.

Upon learning that the military police had arrested Bowman and removed him from the custody of the District of Columbia without authorization, Judge Block wrote the Army authorities requesting that Bowman be returned immediately. An attachment order of even date directed the United States Marshal, the District of Columbia Chief of Police, or any authorized law enforcement officer to return Bowman forthwith to Saint Elizabeth's Hospital to complete his treatment there.[5] The Military disregarded this and a subsequent order of the Superior Court directing that a

---

2. Because Fort Dix does not have an adequate confinement facility, in accordance with an interservice support agreement Bowman was kept in pre-trial confinement at the Philadelphia Naval Yard. The Navy is not involved in these proceedings; we refer in this opinion to the Army and the Military interchangeably.

3. A military detainer is a written request to the civilian authorities that they notify the Armed Forces police detachment when the service member is ready for release from civilian confinement.

4. The plan required Bowman to reside with his mother, report to the hospital's outpatient department once a week, attend Alcoholics Anonymous meetings, and participate in a Model Neighborhood Area Community Mental Health Center program.

5. The order was issued under authority of D.C. Code § 24–301(i), which authorizes the court to order the return of a person who escapes from a psychiatric hospital to which the person has been confined. *See* note 19 *infra*.

hearing be held to review Bowman's custodial status.

Bowman then instituted these habeas corpus proceedings, alleging that the Army was denying him the psychiatric treatment and care to which he was entitled pursuant to his mandatory commitment by the Superior Court. He also objected to his removal by the Army from the jurisdiction of the Superior Court, which had never relinquished its claim of exclusive jurisdiction over him. Finally, Bowman objected to his removal from the care of a psychiatric hospital in one jurisdiction to military confinement in another without a court hearing and an opportunity to challenge the basis of the removal, asserting that his fourth amendment right to be free from illegal seizures had been violated.

The district court granted the writ of habeas corpus and ordered that Bowman either be returned directly to the custody of the District of Columbia or be held by the Army at Fort Meade, Virginia and be made available for the hearing which Judge Block had ordered so that he could determine whether Bowman should remain an outpatient, be recommitted to Saint Elizabeth's, or be remanded to the custody of the Military. The district court also stayed all pending military court-martial proceedings against Bowman pending the outcome of the Superior Court hearing. Although this court decided that in the interim the Military should retain custody of Bowman, we ordered a continuation of the district court's stay of court-martial proceedings and permitted the Superior Court hearing to be held pending plenary review of this appeal.[6]

Bowman was returned to the District of Columbia and appeared before Judge Block, who ordered a psychiatric examination of Bowman. At a subsequent hearing, testimony based on the psychiatric examination revealed that although Bowman was not exhibiting any signs of acute alcoholic psychosis or organic impairment, diagnoses which had led to his acquittal by reason of insanity, he nonetheless was suffering from a severe paranoid personality disorder which required treatment. Judge Block then filed an interim decision in which he found that Bowman was neither in any immediate need of hospitalization nor entitled to unconditional release. The court refrained, however, from making a finding as to what level of commitment was required by Bowman's therapeutic needs pending the outcome of this appeal.

This case reaches us in an unusual posture. The underlying substantive question posed by this dispute is who may now first exercise jurisdictional authority over Bowman—the Superior Court or the military authorities. Bowman maintains that only Judge Block may determine his custodial status.[7] For its part the Military asserts that it is entitled to proceed immediately with its court-martial of Bowman. The district court disagreed with the Military and ordered Bowman returned to permit the Superior Court to decide how to accommodate Bowman's therapeutic needs with the Army's desire to expedite the court-martial. In view of the pendency of the instant appeal the Superior Court withheld disposition, deferring to our review of the district court's determination that the Superior Court and not the Military should first exercise authority over Bowman.

On this appeal we are called upon to address the more limited question whether the district court properly granted Bowman's habeas petition staying ongoing mili-

---

6. See note 1 *supra*.

7. Throughout the course of these proceedings, Judge Block has asserted that it is for him initially to decide the question of Bowman's disposition. In his order of March 29 directing the Military to return Bowman to his custody so that a custodial hearing could be held, Judge Block made it clear that any decision that he would reach would take into account Bowman's military obligations and the serious na-

ture of the pending military charges. There is no reason to believe that Judge Block would in any way impede the Military's right ultimately to continue the court-martial proceedings. He merely asserted the right to decide when transfer to the Military should take place. It is not apparent whether he would also assert the right to define some of the conditions of Bowman's military confinement, including a plan of treatment.

tary proceedings in favor of the authority of the Superior Court. The Military raises three principal objections to the issuance of the habeas writ by the district court. First, the Military argues that Bowman lacks standing to challenge which of two sovereign authorities with the right to have custody of him first exercises its authority. Second, it argues that because Bowman has failed to exhaust his remedies in the military system the grant of habeas relief was inappropriate. Finally, the Military contends that in any event under principles analogous to those of *Younger v. Harris* the district court should not have interfered with pending military court-martial proceedings.

## II.

### A.

The question of standing is whether a particular litigant is entitled to have the court decide the merits of the dispute. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Any inquiry into the contours of the standing doctrine must begin with and accommodate the basic limitation of federal court jurisdiction in Article III of the United States Constitution to "Cases" and "Controversies." U.S.Const.Art. III, § 2; *see Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). For a constitutionally justiciable case or controversy to exist, the question at issue must be "presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). To insure that sufficient adverseness between the litigants

with respect to the question at hand exists, the standing doctrine requires that the plaintiff allege " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin, supra*, 422 U.S. at 498–99, 95 S.Ct. at 2204–05 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

■ There have evolved over the years, in addition to the Article III limitations on a litigant's standing to sue, a series of prudential limitations that are closely related to their constitutional counterparts. These limitations deny standing to a litigant who, although he has alleged a sufficient stake to establish a constitutionally adequate case or controversy, for other reasons is not deemed an appropriate party to assert a particular claim. *See Warth v. Seldin*, 422 U.S. 490, 499–501, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975).

In *Association of Data Processing Service Organizations, Inc. v. Camp, supra*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184, the Supreme Court formulated a general framework for analyzing standing questions, applicable to situations such as the instant controversy, which incorporates both the constitutional and prudential limitations. The Court expressed these limitations in terms of two queries: (1) "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and (2) "whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152, 153, 90 S.Ct. at 829.[8] The constitutional requirements of standing are satis-

---

**8.** Although this formulation arose in the context of a challenge to administrative action on statutory grounds, it has been given wider application, *see, e.g., Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 320 n.3, 97 S.Ct. 599, 602 n.3, 50 L.Ed.2d 514 (1977); *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152, 1155–56 (3d Cir. 1981); *White v. United States Pipe & Foundry Co.*, 646 F.2d 203, 205–06 (5th Cir. 1981); *National Black Police Ass'n v.*

*Velde*, 631 F.2d 784, 787 n.16 (D.C.Cir.1980), *cert. granted*, 451 U.S. 969, 101 S.Ct. 2044, 68 L.Ed.2d 347 (1981); *Schiaffo v. Helstoski*, 492 F.2d 413, 421–22 (3d Cir. 1974); L. Tribe, *American Constitutional Law* § 3–17, at 80 n.4, and provides a useful framework for analyzing the instant dispute, involving a standing claim based on rights created under one aspect of the comity doctrine. See note 17 *infra*.

fied if "the plaintiff alleges that the challenged action caused him injury in fact, economic or otherwise." *Id.* The contours of the injury-in-fact requirement, while not precisely defined, are very generous. Once a plaintiff has alleged some specific, "identifiable trifle" of injury, *see United States v. SCRAP*, 412 U.S. 669, 686–90 & 689 n.14, 93 S.Ct. 2405, 2415–17 & 2416 n.14, 37 L.Ed.2d 254 (1973) quoting Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 613 (1968)), that is fairly traceable to the defendant's conduct, *see Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978), the requirement of a constitutionally adequate stake in the controversy is satisfied.

Prudential standing requirements in this context are addressed not to whether the plaintiff is injured but whether the interest asserted by the plaintiff is arguably within the zone of interest sought to be protected or regulated by the statute or rule of law in question.[9] *Association of Data Processing Service Organizations, Inc. v. Camp, supra*, 397 U.S. at 153, 90 S.Ct. at 829. The zone of interest test thus closely resembles the question whether a litigant has stated a claim "showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a), *i.e.* in more traditional terminology whether the plaintiff has stated a cause of action. Both inquiries address the ultimate question whether the litigant may properly invoke the power of the court to obtain the relief he seeks.[10]

■ The Supreme Court has only sparingly suggested the analytical contours of

---

**9.** Another prudential limitation on standing to sue reflects a concern for the proper allocation of the decision making function and concomitantly the proper role of the courts in a democratic society. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Thus, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," *id.* at 499, 95 S.Ct. at 2205 the legislature and not the courts is normally the proper forum in which to address the issue.

**10.** The distinction between a dismissal for lack of standing based on a failure to satisfy the zone of interest test and a dismissal for failure to state a cause of action can best be illustrated by reference to the situation in which they most resemble each other, viz. when courts are called upon to imply causes of action under statutes not expressly providing a remedy to a particular class of litigants. In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), Justice Brennan writing for the majority suggested a framework for distinguishing the questions of jurisdiction, standing, cause of action, and relief in the context of implied causes of action:

Thus it may be said that *jurisdiction* is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case; *standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal court jurisdiction; *cause of action* is a question of whether a particular plaintiff is a member of

the class of litigants that may, as a matter of law, appropriately invoke the power of the court; and *relief* is a question of the various remedies a federal court may make available. Id. at 239 n.18, 99 S.Ct. at 2274 n.18 citations omitted).

When the question is whether *any* plaintiffs are entitled to relief under a statute which does not expressly provide the relief which is sought, the question is properly framed as whether a cause of action can be implied. The court must in that case decide whether a newly-fashioned remedial structure should be made available to a class of litigants not expressly entitled to relief under the statute. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *cf. Local 2855, AFGE v. United States*, 602 F.2d 574, 582 & n.28 (3d Cir. 1979) (action taken under statute and regulations conferring broad discretion to Army not reviewable under APA for lack of adequate standards).

In contrast, when there already exists a cause of action prescribing a particular remedy for a defined class of persons and the question is simply whether a particular plaintiff is *also* entitled to that relief, the question is properly addressed as one of standing. In such a case, the inquiry focuses on whether the plaintiff is the proper person to press the claim. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *But cf. Rakas v. Illinois*, 439 U.S. 128, 138–40, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1978) (inability of third parties to challenge illegal searches of others under fourth amendment a question of substantive law).

the zone of interest test.[11] A review of its decisions and decisions of other federal courts applying the zone of interest test reveals that whether a litigant may be said to fall within the parameters of that test can be analyzed in two complementary ways: first, whether the person asserting a claim is the intended beneficiary of the rule of law which he invokes,[12] and second, whether he is advancing his own legal interests or those of another. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978); *Singleton v. Wulff*, 428 U.S. 106, 123 n.2, 96 S.Ct. 2868, 2878 n.2, 49 L.Ed.2d 826 (1976); *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152, 1155–56 (3d Cir. 1981). Resolution of the first question, which implicates the zone of interest test in its primary sense, requires the court to consider the plaintiff's standing by refer-

ence to the nature of the legal right created under the rule of law which he invokes.[13]

The question whether a litigant is within the zone of interest of a rule of law whose benefit he invokes may also be framed in appropriate cases by reference to the concept of third-party standing, *see, e.g., Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978); *Singleton v. Wulff*, 428 U.S. 106, 123 n.2, 96 S.Ct. 2868, 2878 n.2, 49 L.Ed.2d 826 (1976); *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152, 1155–56 (3d Cir. 1981), which creates a limited exception in constitutional challenges to the zone of interest requirement. For a person who himself can allege injury in fact[14] to be permitted to assert the constitutional rights of another, thereby seeking redress of both his own injury and that of the third party,[15] two requirements

11. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 & n.6, 99 S.Ct. 1601, 1608 & n.6, 60 L.Ed.2d 66 (1979); *Rakas v. Illinois*, 439 U.S. 128, 139–40, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1978); *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 320 n.3, 97 S.Ct. 599, 602 n.3, 50 L.Ed.2d 514 (1977); *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *id.* at 123–25 & 123 n.2, 96 S.Ct. at 2878–2879, 2878 n.2 (Powell, J., concurring in part and dissenting in part); *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 469, 94 S.Ct. 690, 698, 38 L.Ed.2d 646 (1974) (Douglas, J., dissenting); *United States v. SCRAP*, 412 U.S. 669, 686 & n.13, 93 S.Ct. 2405, 2415 & n.13, 37 L.Ed.2d 254 (1973); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 641, 91 S.Ct. 1091, 1104, 28 L.Ed.2d 367 (1971) (Harlan, J., dissenting); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (per curiam); *Barlow v. Collins*, 397 U.S. 159, 164–65, 90 S.Ct. 832, 836–37, 25 L.Ed.2d 192 (1970). *Cf. Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 59–60 & 60 n.9, 96 S.Ct. 1917, 1934 & n.9, 48 L.Ed.2d 450 (1976) (Brennan, J., concurring in the judgment); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 236, 94 S.Ct. 2925, 2962, 41 L.Ed.2d 706 (1974) (Brennan, J., dissenting) (arguing that prudential limitations are not properly standing questions).

12. *See, e.g., Boston Stock Exchange v. State Tax Comm.*, 429 U.S. 319, 320 n.3, 97 S.Ct. 599, 602, n.3, 50 L.Ed.2d 514 (1977); *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Taylor v. Jones*, 653 F.2d 1193, 1207–08 (8th Cir. 1981); *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir.

1980); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 168 (D.C.Cir.1980), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *Moore v. Tangipahoa Parish School Bd.*, 625 F.2d 33, 34 (5th Cir. 1980) (per curiam); *Wilmington United Neighborhoods v. HEW*, 615 F.2d 112, 117 (3d Cir. 1980), *cert. denied*, 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1981); *Ellis v. HUD*, 551 F.2d 13, 16 (3d Cir. 1977).

13. Although the zone of interest test replaced and was intended to broaden its predecessor— an inquiry into whether the plaintiff had a "legally cognizable interest," *see, e.g., Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *Tennessee Elec. Power Co. v. Tennessee Valley Auth.*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Alabama Power Co. v. Ickes*, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), resolution of the zone of interest question turns on the nature and source of the claim asserted. "Essentially the [prudential] standing question . . . is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

14. The constitutional requirement of injury in fact is a touchstone of standing to sue and can never be foregone.

15. A party asserting third-party standing claims that "a single application of a law both injures him and impinges upon the constitutional rights of third persons." Note, *Standing*

must be satisfied. First, not only must there be a close relationship between the litigant and the person whose right he is asserting, but the activity the litigant proposes to pursue must be inextricably bound up with the constitutional right of the person from whom the right is drawn. *See Singleton v. Wulff*, 428 U.S. 106, 114–15, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976) (plurality). Second, there must exist some obstacle to the third party asserting his or her own rights. *Id.* at 115–16, 96 S.Ct. at 2874–75. If both requirements are met, a party who is injured by the conduct of another but is not the beneficiary of the constitutional right proscribing that conduct can nonetheless complain of that injury by asserting the right of the injured third party.[16] With this framework we now consider whether Bowman has standing to assert his claim that his detention by the Military in derogation of the authority of the District of Columbia court is impermissible.

### B.

The general rule for resolving the claims of jurisdictions competing to proceed against an individual charged with criminal violations has long been that

the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose.

*Ponzi v. Fessenden*, 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607 (1922). *See United States v. Warren*, 610 F.2d 680, 684–85 (9th Cir. 1980). The need for such a rule arises because

[w]e live in the jurisdiction of [multiple] sovereignties, each having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfill their respective functions without embarrassing conflict unless rules were adopted by them to avoid it.

*Ponzi v. Fessenden, supra*, 258 U.S. at 259, 42 S.Ct. at 310. It is the structure of our federal system which requires that each sovereignty respect "a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure." *Id.*

Thus, the rule of law that governs which of two authorities has priority of jurisdiction over a person in legal custody contemplates avoiding conflict among competing jurisdictions in our federal system. Those who assert jurisdiction, not those in their custody, are the beneficiaries of the rule allocating priority of prosecution to the sovereignty which first takes custody of a person.[17]

Recognizing that the issue of which of two authorities or sovereigns may detain and first proceed to prosecute an individual has significance for the coordination of criminal law at the interface of federal and

to *Assert Constitutional Jus Tertii*, 88 Harv.L. Rev. 423, 424 (1974). The overbreadth doctrine, limited to challenges based on the first amendment, is closely related to the doctrine of third-party standing. It differs in that the "claimant seeks to assert the rights of *hypothetical* third persons to whom the challenged law could conceivably apply in a manner that would violate their constitutional rights." *Id.* (footnote omitted) (emphasis added).

16. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), illustrates the application of this principle. In that case a beer vendor alleged economic injury because of a state statute prohibiting the sale of "nonintoxicating" 3.2% beer (now more commonly referred to as "lite beer") to males under the age of 21 but barring sales to females under the age of 18.

The vendor, injured economically, was permitted to raise the gender-based equal protection claim of 18–20 year old males although she did not fall within the zone of interest of the Equal Protection Clause. The Court noted that the vendor was the "least awkward challenger" of the statute, *id.* at 197, 97 S.Ct. at 456, since the males themselves would make up a class with "fluid membership." *Id.* at 194, 97 S.Ct. at 455.

17. Although this aspect of the comity doctrine is a common law principle and not a statutory or constitutional rule, that does not render the injury-in-fact/zone of interest test inapposite. The basic inquiry remains the same, viz. whether the rule of law whose protection the plaintiff seeks to invoke contemplates protecting the plaintiff.

state systems, numerous decisions have concluded that "[t]he exercise of jurisdiction over a prisoner who has violated the law of more than one sovereignty and the priority of prosecution of the prisoner is solely a question of comity between the sovereignties which is not subject to attack by the prisoner." *Derengowski v. United States Marshal*, 377 F.2d 223, 224 (8th Cir.), *cert. denied*, 389 U.S. 884, 88 S.Ct. 144, 19 L.Ed.2d 180 (1967). He has no standing to raise the issue. *Id.* at 223–24.[18]

A decision of this court illustrates the application of these principles. In *United States ex rel. Brewer v. Maroney*, 315 F.2d 687 (3d Cir. 1963), a federal parolee was taken into custody by state officials and incarcerated for violating a state parole order that antedated the parolee's federal conviction. The parolee brought a writ of habeas corpus and objected that while he was on parole he was subject to exclusive federal jurisdiction, and that for the state to assert jurisdiction over him violated the principles of comity, or alternatively, the supremacy clause. This court acknowledged that a parolee is subject to the jurisdiction of the sovereign that placed him on parole, and that such a person is sufficiently "within custody" to invoke the writ of habeas corpus in order to attack the conviction that is the basis of the parole. *Id.* at 688. As this court went on to observe,

> However, this does not mean that another sovereign is precluded from asserting jurisdiction over him for violation of its own parole order. Such a transgressor can hardly be said to have standing to raise a question which is of interest only to the sovereigns involved.

*Id.*

The district court in the case at bar sought to distinguish this great weight of authority by attempting to identify some concrete injury to Bowman, absent in the other cases, that would confer standing on him. The district court identified two such harms. First, the court noted that in all of the other decisions the transferring authority had either explicitly or implicitly "waived its right to jurisdiction of the prisoner in determining that the comity issue was only a concern of the sovereign involved." 514 F.Supp. at 409. In no other decision had the petitioner been placed "in the dilemma of having conflicting legal obligations to two jurisdictions both of which were actively asserting control over him." *Id.* The district court concluded that because Bowman's removal from the District of Columbia placed him in contravention of the Superior Court's conditional release order, there remained "serious legal implications for now and in the future[,] but his present incarceration makes it impossible for him to clarify his status." *Id.* at 410.[19]

The district court's belief that Bowman faces potential legal sanctions for "fleeing" the District of Columbia is illusory. The district court itself acknowledges that in the event this court directs that Bowman be remanded to the Superior Court, that court will give careful consideration to all of the facts, including the court-martial charges outstanding against Bowman, before taking any action regarding him. 514 F.Supp. at 415. It is unlikely that the Superior Court would hold Bowman in contempt for a re-

---

**18.** *Accord, e.g., Weathers v. Henderson*, 480 F.2d 559, 559 (5th Cir. 1973) (per curiam); *Lindsay v. United States*, 453 F.2d 867, 868 (3d Cir.), *cert. denied*, 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 127 (1972); *Joslin v. Moseley*, 420 F.2d 1204, 1206 (10th Cir. 1969); *McDonald v. United States*, 403 F.2d 37, 38 (10th Cir. 1969) (per curiam); *United States ex rel. Brewer v. Maroney*, 315 F.2d 687, 688 (3d Cir. 1963); *Potter v. Ciccone*, 316 F.Supp. 703, 706 (W.D. Mo.1970).

**19.** The district court relied on orders of attachment and return which were issued pursuant to D.C.Code § 24–301(i). The section provides in relevant part:

> When a person has been ordered confined in a hospital for the mentally ill pursuant to this section *and has escaped from such hospital*, the court which ordered confinement shall, upon request of the government, order the return of the escaped person to such hospital.

(Emphasis added.) The district court declined to accept the Army's contention that the provision was inapplicable to Bowman on the ground that he was not an escapee. *See* 514 F.Supp. at 410 n.10, 413.

moval from the court's jurisdiction over which he had no control. More importantly, the Superior Court could not, consistent with the requirements of due process, hold Bowman in contempt when he did not voluntarily remove himself from the District of Columbia. Therefore, as to this claim Bowman cannot be shown to possess the minimum requisite injury in fact.

The second harm to which the district court alluded as a basis for standing is the denial of Bowman's right to "the treatment for mental illness which was the justification for his involuntary commitment." *Id.* at 411. Under D.C.Code § 21–562, a person committed to a psychiatric hospital following an acquittal by reason of insanity has a statutory right to treatment that is cognizable in habeas corpus. Regardless of the scope of the right to treatment created by the District of Columbia statute or otherwise, Bowman cannot assert the alleged denial of necessary treatment as a basis for his release and return to the jurisdiction of the Superior Court. Although Bowman's military confinement may deprive him of treatment comparable to the care he had been receiving in the District of Columbia and thus may constitute an injury in fact,[20] that injury does not place him within the zone of interest of the rule of comity which he must invoke in order to challenge his custody by the Military in derogation of the authority of the District of Columbia.[21] The beneficiary of that rule is not Bowman

but the competing jurisdictions in a federal system of government.

To the extent that Bowman suffers from ongoing mental disease and requires therapeutic attention, his needs can be taken care of by the Military. If they are not, he can directly challenge the inadequacy of the Military's custodial care. The alleged inadequacy of his treatment at the naval brig in Philadelphia does not, however, establish a basis for Bowman to assert the jurisdiction of the Superior Court over him or for a writ of habeas corpus to release him from illegal detention.

■ Nor is Bowman entitled to assert his right under the third-party standing exception to the zone of interest requirement. First, it is dubious whether the rule of comity invoked here creates constitutional rights. Even if it does, the second element required to assert third-party standing— that the third party (the District of Columbia) is in some way hampered from asserting its own right—is plainly lacking. It would appear that if the District of Columbia desires to regain custody of Bowman, it should proceed by writ of habeas corpus ad prosequendum.

■ The district court also attempted to distinguish the line of cases denying standing to someone in Bowman's position on the ground that its application is limited to situations where the person who would complain is a "transgressor" or "prisoner."

---

**20.** It is unclear whether Bowman has indeed suffered any actual psychiatric harm by reason of his incarceration by the Military. The record establishes that although Bowman is not now receiving psychiatric treatment, he has been examined by military psychiatrists and has been determined to be fit to stand trial. The Military has also attended to his other medical needs. At the competency hearing held before Judge Block, following the district court's order, it was determined that Bowman is not in any immediate need of hospitalization.

**21.** Bowman's status as an outpatient at Saint Elizabeth's may be compared to that of a parolee who is taken into custody by another jurisdiction to face criminal charges. Like the right to parole, the right to treatment under § 301(d)(1) is not absolute. Thus even when a particular mode of treatment is contended to be

essential to the continued improvement of a person committed under § 301(d)(1), that treatment can be withheld if its benefit is outweighed by the potential for harm to others. *United States v. Ecker*, 543 F.2d 178, 199–200 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

Although the granting of parole confers on the parolee certain rights, those rights may not be asserted as a basis for objecting to the parolee's prosecution in a second state prior to the expiration of his parole. *See* p. 1154 *supra*. Similarly, the removal of a person from an outpatient treatment program maintained under the auspices of one jurisdiction normally will not grant him standing to challenge his prosecution in another jurisdiction prior to the expiration of his treatment program. *See* note 22 *infra*.

As Bowman was neither at the time of his transfer, having been acquitted of criminal charges and ultimately released from psychiatric confinement, the district court held that these cases were inapplicable to him. The district court's attempted distinction fails on its own terms. Although Bowman was not a transgressor or prisoner in the District of Columbia, he had been properly charged and had been awaiting trial for crimes committed while in military service. It would be anomalous to hold that Bowman's acquittal in the District of Columbia by reason of insanity also controlled his status in the eyes of the Military, an escapee charged with serious military crimes.[22] We therefore hold that a serviceman under court-martial lacks standing to challenge pending court-martial proceedings on the ground that by his subsequent criminal activity he has also subjected himself to the authority of another jurisdiction.

**22.** Standing to seek his return to the District of Columbia is not conferred on Bowman merely because of his removal from Saint Elizabeth's outpatient facility. It has long been settled that even when a removal is forcible

> the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." . . . [D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly appri[s]ed of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.

Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) (footnote omitted); see Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886) ("[F]orcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objections to his trial in such court.")

Potter v. Ciccone, 316 F.Supp. 703 (W.D.Mo. 1970), involved facts in some ways similar to those now before the court. In Potter, the petitioner for habeas corpus had been arrested for a federal parole violation, escaped, and then committed a burglary. The state court before which he was charged dismissed the criminal charges and placed him in a state mental institution for treatment. Upon learning of the petitioner's whereabouts, United States Marshals went to the hospital and forcefully took him into their custody without the permission of the hospital or the court and in total disregard of

### III.

▮ Bowman has also challenged in the district court and on appeal the legality of his detention by the Military on the grounds that the manner in which he was transferred from the Superior Court's jurisdiction to the Military violated both internal military regulations and his fourth amendment rights. Although Bowman had standing to raise these specific claims,[23] the grant of habeas corpus with respect to them would be improper.[24] For although it is well settled that habeas relief ordinarily is available to a person who claims that he is being unlawfully detained by the Army, see Parisi v. Davidson, 405 U.S. 34, 39, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972); Apple v. Greer, 554 F.2d 105, 107 (3d Cir. 1977); Meck v. Commanding Officer, 452 F.2d 758, 760 (3d Cir. 1971), Bowman's habeas claim is barred by the twin doctrines of exhaustion of military remedies and the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27

the state court's treatment order. See id. at 705. The federal court concluded, inter alia, that the petitioner had no standing to complain about the manner in which he came into otherwise lawful federal custody. Id. at 706.

Potter presents a more extreme situation than we have here. Whether prudential standing considerations under the rule of comity might give way in a situation where the interruption of important treatment threatens immediate, irreparable physical or mental harm to the patient is one we need not address because in the case at bar the party is receiving only outpatient treatment at a relatively low level.

**23.** In each of these claims, the right asserted is one which defines a zone of interest into which the plaintiff plainly falls. The military regulations provide for the orderly transfer of prisoners from one jurisdiction to another; Bowman is the beneficiary of that regulation. And it is beyond cavil that the fourth amendment establishes standing for a person to complain of an illegal seizure.

**24.** The district court held that the Military violated Army Regulation 1909 which sets out the policies and provides the procedures for the apprehension and return to military custody of Army absentees and deserters. See 514 F.Supp. at 413–15. The court did not reach Bowman's fourth amendment claim; that claim, however, has been preserved on appeal. Because of our disposition of this case we do not reach the merits of either of these claims.

L.Ed.2d 669 (1971). *See Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *Gusik v. Schilder*, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950); *Apple v. Greer*, 554 F.2d 105 (3d Cir. 1977).

In *Gusik v. Schilder*, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950), the Supreme Court concluded that the policy underlying the rule requiring the exhaustion of state remedies in federal habeas proceedings challenging the jurisdiction of a state court was applicable to habeas actions involving servicemen who were the subject of court-martial proceedings. The Court held that a serviceman in the custody of the Military must exhaust all available remedies within the Military before a federal court can entertain a petition for habeas corpus.[25]

> An analogy is a petition for habeas corpus in the federal court challenging the jurisdiction of a state court. If the state procedure provides a remedy, which though available has not been exhausted, the federal courts will not interfere. . . . The policy underlying that rule is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts. If an available procedure has not been employed to rectify the alleged error which the federal court is asked to correct, any interference by the federal court may be wholly needless. The procedure established to police the errors of the tribunal whose judgment is challenged may be adequate for the occasion. If it is, any friction between the federal court and the military is saved.

*Id.* at 131–32, 71 S.Ct. at 151–52.

The appropriateness of any federal court intervention in ongoing military proceedings was addressed in *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Councilman was an Army captain charged with possessing and selling marijuana at his off-post apartment. When the court-martial denied Councilman's motion to dismiss the charges for lack of jurisdiction on the ground that the alleged offenses were not "service-connected," he sought to enjoin the impending court-martial proceedings in federal district court. Councilman asserted that if the proceedings were not enjoined he "[would] suffer great and irreparable damage in that he [might] be deprived of his liberty without due process of law." 420 U.S. at 742, 95 S.Ct. at 1305.

In reversing the decision of the court of appeals which had affirmed the granting of the injunction, the Supreme Court concluded that considerations analogous to those which normally preclude equitable intervention in pending state criminal proceedings counsel against equitable intervention by federal courts in pending court-martial proceedings. In the context of the ongoing relationship between the state and federal judicial systems, considerations of comity, *i.e.,* "the necessity of respect for coordinate judicial systems," *id.* at 756, 95 S.Ct. at 1312, require that federal courts not interfere with ongoing state criminal proceedings "unless the harm to be averted is 'both great and immediate,' of a kind that [']cannot be eliminated by . . . defense against a single criminal prosecution.[']" *Id.* (citing *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971); *Fenner v. Boykin*, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926)).

The Court also discussed the relationship between the rule barring federal intervention in pending state court proceedings except in extraordinary circumstances and the requirement that petitioners seeking habeas relief from state criminal convictions must first exhaust available state remedies, not-

---

**25.** *Gusik* involved a collateral challenge to a court-martial judgment. Although the petitioner had pursued all remedies available at the time of trial, after the filing of his habeas petition Congress promulgated Article 53 of the Articles of War, 62 Stat. 639 (1948), which gave the Judge Advocate General discretion to grant a new trial after any court-martial proceeding. The Court held that the petitioner first had to avail himself of the new remedy, but, because the district court trial had ended before the effective date of Article 53, directed the court of appeals to retain jurisdiction of the case pending the outcome of the petitioner's Article 53 motion.

ing that both doctrines are rooted in considerations of comity and reflect the principle that "the federal courts are 'not at liberty . . . to presume that the decision of the State court would be otherwise than is required by the fundamental law of the land . . . .' " 420 U.S. at 756, 95 S.Ct. at 1312 (quoting *Ex parte Royall*, 117 U.S. 241, 252, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886)).

Finally, the Court observed that there were practical considerations underlying both the federal equity rule barring federal intervention in pending state court proceedings except in extraordinary circumstances and the habeas exhaustion requirement similar to those that underlie the requirement that persons aggrieved by agency action must first exhaust all administrative remedies. In all three cases, deferring judicial review allows a body peculiarly expert in a particular area initially to develop the facts, apply the law, and correct its own errors. Such deference ensures that any judicial review will be informed and narrowed by the agency's own decisions, and avoids unnecessary duplicative proceedings. *Id.* at 756–57, 95 S.Ct. at 1312–13.

The Court then concluded that all of these considerations

> apply in equal measure to the balance governing the propriety of equitable intervention in pending court-martial proceedings. . . . While the peculiar demands of federalism are not implicated, the deficiency is supplied by factors equally compelling.
>
> . . . Congress created an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals consisting of civilian judges "completely free from all military influence or persuasion," who would gain over time thorough familiarity with military problems.

> . . . [I]mplicit in the congressional scheme embodied in the Code is the view that the military court system generally is adequate to and responsibly will perform its assigned task. We think this congressional judgment must be respected and that it must be assumed that the military court system will vindicate servicemen's constitutional rights.

*Id.* at 757–58, 95 S.Ct. at 1313 (footnote and citations omitted). The Court therefore held that "when a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise." *Id.* at 758, 95 S.Ct. at 1313.

This court has had occasion to consider the intersection of the requirements of *Gusik* and *Councilman* in *Apple v. Greer*, 554 F.2d 105 (3d Cir. 1977). *Apple* involved a habeas petition brought to obtain federal court review of the legality of a serviceman's induction into the Army.[26] Rather than face a military court-martial for being absent without leave, Apple petitioned for a writ of habeas corpus seeking to enjoin the pending court-martial proceeding. He alleged that he was being unlawfully detained by the Military because his induction into the Army was invalid, and sought a federal court determination to that effect. This court reversed the district court's grant of the writ, concluding that the military courts were capable of passing on the legality of Apple's induction.

Because the relief requested by Apple appears to be available with reasonable promptness through the military judicial system, the district court should not have acted on the habeas corpus petition until after Apple's claims had been considered by the military. By deferring to the military system, friction between the federal

---

**26.** In 1968 Apple applied for and was denied conscientious objector status by his local Selective Service Board, which did not state its reasons for the decision. After serving in the Army for more than eight months, Apple left without authorization and settled in Canada. In 1974 Apple learned of judicial decisions holding that a selective service registrant who submits a prima facie claim seeking conscientious objector status is entitled to be told the reasons for the denial of his application. He returned to the United States, surrendered to the military authorities, and simultaneously instituted his habeas corpus action.

courts and military tribunals can be avoided. In addition, duplicative proceedings may be averted if corrective action is taken with reasonable promptness in the military, thus obviating the need for federal court intervention.

*Id.* at 110 (footnote omitted).

In the case at bar, the district court determined that the exhaustion requirement did not bar habeas relief. It noted that the Army court-martial convened to try Bowman had agreed to a continuance of the court-martial proceedings pending resolution of the jurisdictional dispute in the civilian courts. 514 F.Supp. at 411–12. The court concluded that "[t]he continuance ordered by the military judge and his deferral to the ruling of an appropriate civilian court makes further exhaustion of remedies within the military unnecessary." *Id.* at 412. That conclusion does not follow. The stay of proceedings by the Army simply reflects the respect which the military justice system accords the federal courts. The officers sitting on the court-martial have indicated a willingness *temporarily* to stay their hand pending final resolution of the jurisdictional dispute in the federal courts, a position which has since been supported by order of this and the district court. In no sense can this be read as an abjuration of the Army's claim to prior jurisdiction over Bowman which is now asserted within the federal court proceedings.

To overcome the second objection to the grant of the writ, namely, that in line with *Younger v. Harris* a district court cannot enjoin ongoing court-martial proceedings if the serviceman can establish no harm other than that attendant to resolution of his case in the military court system, the district court relied on the injuries identified in its discussion of standing: Bowman's serious legal difficulties in the District of Columbia, and his need of the psychiatric care to

which he is entitled. The inadequacy of these two positions has already been discussed.

IV.

 Bowman's claim that the Superior Court has priority of jurisdiction can be raised in the court-martial proceedings.[27] His fourth amendment claim can also be raised there. The Army is fully capable of providing Bowman with any psychiatric treatment which he may require. The court-martial is capable of considering, indeed must consider, any defenses based on insanity which Bowman may raise. In sum, all of Bowman's claims may be fully litigated in the pending court-martial proceedings.

The grant of the writ of habeas corpus will be reversed and the stay of court-martial proceedings will be vacated.

---

27. Indeed, because the military courts are not created under authority of Article III of the Constitution, they are not bound by the same standing restrictions which govern the federal courts. *Cf. Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) (Supreme Court barred from hearing appeal

from state court decision on standing grounds; state court decision left intact). Thus Bowman may before the court-martial press his claim that the District of Columbia should have custody of him despite his lack of standing to raise the claim in federal district court.