607 F.2d 37
 John MARCHEZAK, G. Richard Moose et al., Appellees,
v.
Myron R. McKINLEY, Market Administrator of Federal Order No.
36 and Referendum Agent, and Robert Bergland,
United States Secretary of Agriculture,
Appellants in Nos. 78-2652 and
79-1090.
John MARCHEZAK et al., Appellees,
v.
MILK MARKETING, INCORPORATED, an agricultural cooperative
corporation, Appellant-Intervenor in Nos. 78-2387
and 79-1094.
 Nos. 78-2387, 78-2652, 79-1090 and 79-1094.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 5, 1979.
Decided Oct. 3, 1979.
 
 Robert J. Cindrich, U. S. Atty., Jeffrey A. Manning (argued), Asst. U. S. Atty., Pittsburgh, Pa., James Michael Kelly, Asst. Gen. Counsel, Raymond W. Fullerton (argued), Director, Litigation Div., Terrence G. Jackson, Thomas R. Clark, Dept. of Agriculture, Washington, D. C., for appellants Myron R. McKinley and Robert Bergland.
 H. Woodruff Turner (argued), David A. Borkovic, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for intervenor-appellant Milk Marketing Incorporated.
 Willis F. Daniels (argued), Harrisburg, Pa., Roland Morris, Sheri B. Friedman, Duane, Morris & Heckscher, Philadelphia, Pa., Henry Rea, Jr., Pittsburgh, Pa., for appellees.
 Before SEITZ, Chief Judge, and GIBBONS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 This is an appeal by the Secretary of Agriculture (the Secretary), the Milk Marketing Administrator of Federal Order Number 36, and Milk Marketing, Inc., from a final order of the district court enjoining the Secretary from enforcing a marketing order issued under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601 Et seq. (1976). The marketing order deals with the method by which producers of milk are to be paid for their products. The plaintiff-appellees are twenty-seven producers of milk who brought this action to challenge the Secretary's authority under the Act to issue the order.
 
 I.
 A.
 
 2
 Before turning to the proceedings in the district court, some understanding of the dairy industry and the federal government's response to its unique problems is necessary. Like many other persons engaged in agriculture, milk producers generally do not sell their products directly in the market. Instead, they rely on middlemen ("handlers") to purchase and distribute their dairy goods. Also like other farmers, milk producers often find themselves subject to wide fluctuation in the prices of their products as well as frequently depressed market conditions. The situation can be exacerbated by natural variations in the supply of milk.
 
 
 3
 Congress addressed the plight of the milk producer in portions of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601 Et seq. (1976) (the Act). In essence, the Act seeks to ensure that all producers selling to handlers receive a uniform price. See, e. g., id. § 608c(5)(A)-(B). To achieve this goal, the Secretary computes a monthly price for each region covered by a milk marketing order. The eastern Ohio-western Pennsylvania region is one such area. See 7 C.F.R. part 1036 (1979).
 
 
 4
 In the mid-1970's, the Secretary became concerned over late payments by handlers to producers in the eastern Ohio-western Pennsylvania region. He decided that the government needed a constant and reliable source of information about the timeliness of handlers' payments to producers. Accordingly, for this and other reasons he filed notice of a hearing and proposed rulemaking pursuant to 7 U.S.C. § 608c(3)-(4) (1976). 42 Fed.Reg. 48,886 (1977). After the hearing and the vote of producers required by 7 U.S.C. § 608c(9)(B) (1976), the Secretary issued milk marketing order number 36. See 43 Fed.Reg. 33,652 (1978), Codified in scattered sections of 7 C.F.R. part 1036 (1979). Because plaintiffs in this case all are independent producers (I. e. not members of an agricultural cooperative), we need only focus on the portions of order 36 relating to independents.
 
 
 5
 The order provides that in two situations a handler pays the money he owes a producer over to the market administrator, who then pays the independent. First, the handler can elect to pay the independent through the administrator. See 7 C.F.R. §§ 1036.71(a)(1), 1036.73(d) (1979). Second, if the handler is late in paying, he must pay through the administrator for three consecutive months. See id. § 1036.73(d). If neither of these two events occurs, then the independent receives payment directly from the handler just as he did before order 36 went into effect.
 
 
 6
 Several features of order 36 are important to note for purposes of this case. First, although all members of a cooperative must receive payment through the market administrator, See id. § 1036.71(a), the order has no effect on the price the producers receive for their milk. Even though the method of payment may vary between independents and cooperative members, they receive exactly the same price. Second, order 36 also does not discriminate between independents and cooperative members as to the time they receive payment. Even if a handler pays an independent producer directly, he must do so by the same day on which the market administrator pays producers. See id. § 1036.73(d). Thus an independent being paid directly gets his money no later than a cooperative member.
 
 
 7
 Third, order 36 does not change the dates for payment that existed prior to its promulgation. Payments for the first half of the month must be paid by the end of the month, those for the second half by the eighteenth day after the end of the month. See id. § 1036.73(a)-(b). This schedule is essentially unchanged from the old one. See 43 Fed.Reg. 33,652, 33,658 (1978). Thus no producer receives money later than he did before order 36 came into effect.
 
 
 8
 Plaintiffs are twenty-seven independent milk producers. They filed this action for an injunction solely to challenge the Secretary's authority under the Act to promulgate the portions of order 36 relating to payment through the market administrator. They do not contest the other provisions of order 36 or the procedure followed in promulgating it. On October 24, 1978, the district court granted them a preliminary injunction, which this court subsequently stayed.
 
 
 9
 Thereafter, the intervenor-defendant Milk Marketing filed a motion to dismiss because the action was collusive and because the plaintiffs were not the real parties in interest. The Secretary and the Market Administrator also filed a motion to dismiss (or for summary judgment in the alternative), arguing that the plaintiffs lacked standing because they had not demonstrated any harm to them from order 36. After a hearing, the district court denied the motions to dismiss and postponed the motion for summary judgment pending the hearing on the final injunction.
 
 
 10
 At the conclusion of that hearing, the district court enjoined the Secretary from enforcing order 36. In an unpublished decision, the court reasoned that Congress had intended the Act to be strictly construed; without specific statutory authorization, the Secretary could not issue the marketing order here.
 
 
 11
 After concluding that the Secretary was powerless to issue the regulation, the court then addressed the plaintiffs' standing. The court seemed to reason that the Secretary's lack of authority to issue order 36 conferred standing on the plaintiffs. In effect, the district court felt that because the Secretary could not issue order 36, producers had a right to receive payment directly from the handlers. This right to direct payment accordingly gave the plaintiffs standing. Thus it concluded that "it is the change in the form of payment which gives the Plaintiffs their standing."
 
 
 12
 The appellants now argue that the plaintiffs lack standing and that the Secretary did have statutory authority under 7 U.S.C. §§ 608c(5)(A), 608c(5)(E) (ii), 608c(7) (1976), to issue order 36. We turn to the standing issue.
 
 II.
 
 13
 Although the past decade has seen considerable confusion in the law of standing, the Supreme Court recently has distilled certain principles from prior cases. In Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Court held that all a plaintiff need prove to satisfy article III of the Constitution is "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." Id. at 79, 98 S.Ct. at 2634. Although in some cases certain "prudential limitations" might bar suit, this two-prong test is all the Constitution requires. See id. at 79-81, 98 S.Ct. 2620.
 
 
 14
 In this court, the controversy between the parties over standing has centered largely on the injury-in-fact part of the standing inquiry. The plaintiffs argue that when a handler pays an independent producer through the market administrator, three harms to the producer occur: (1) loss of the right to demand payment from the handler, (2) loss of the right to enforce payment, and (3) loss of the right to proceed against a bond posted by their handlers. The defendants counter that these injuries are too remote and speculative because none of the plaintiffs are receiving payment through the market administrator. A stipulation of the parties in the district court expressly states that all the plaintiffs have been paid on time by their handlers. Moreover, the plaintiffs introduced no evidence either that any handler involved in this case intended to elect payment through the market administrator or that any of those handlers were about to become late in payment. Because these are the only two situations in which an independent producer receives payment through the market administrator, the defendants argue that the claimed injuries may never occur and thus are too hypothetical to confer standing.
 
 
 15
 Although in some cases the claimed injury may be too speculative to confer standing, we need not decide that question in this case. For even if the plaintiffs were being paid through the market administrator, they introduced no evidence to show that the alleged injuries in fact would occur. It is important to note the procedural posture of this case. This is not an appeal from a motion to dismiss, where the only record usually is the pleadings and affidavits of the parties. See Warth v. Seldin, 422 U.S. 490, 501-02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Cf. Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37 n.15, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (where standing decided on motion for summary judgment and where affidavits, which were sole evidence, merely repeat complaint, analysis the same as with motion to dismiss). Instead, the district court did not rule on the motion for summary judgment until after the full hearing on the final injunction. At that hearing, the only evidence introduced by the plaintiffs was the rulemaking decision and order relating to order 36, a bulletin announcing that plaintiffs' handlers were covered by the order, and the stipulation of the parties. Thus even though the only real record consists of the complaint and the affidavits, there is no question that the plaintiffs had full opportunity to develop the facts necessary to establish standing.
 
 
 16
 Although somewhat uncertain as to other points, the law of standing has never deviated from the requirement that there be evidence in the record of the injury in fact. For example, in Sierra Club v. Morton, 405 U.S. 727 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Court rejected an environmental group's standing because there was no evidence in the record or allegation in the complaint that the group's members used the park affected by the challenged activity. The next year the Court upheld a similar claim where the group alleged in the complaint that its members used recreational facilities in the area in question. See United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).
 
 
 17
 Duke Power, supra, also illustrates this concern over support in the record for alleged injury. Environmental groups and residents sued a power company planning a nuclear power plant, in part seeking a judgment declaring that a federal statute imposing a ceiling on the company's liability for accidents was unconstitutional. The district court held four days of hearings on standing and found a "but-for" causal link between the federal statute and the claimed injury to the environment. See 438 U.S. at 72, 74, 98 S.Ct. 2620. The Supreme Court relied heavily on this evidence in upholding the standing of the plaintiffs. Id. at 72-81, 98 S.Ct. 2620. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979) ("The presence of a genuine injury (in standing cases) should be ascertainable on the basis of discrete facts presented at trial.") (footnote omitted).
 
 
 18
 No similar facts are present here despite the plaintiffs' opportunity to present them at the hearing on the permanent injunction. We note initially that this case presents no question of harm from delay in receipt of payment. At oral argument, the plaintiffs suggested that the crucial issue is who gets the use of the money owed to producers. Although the handler pays the market administrator three days before he must pay the producer if he pays directly (thus giving the market administrator the money for three days), See 7 C.F.R. § 1036.71(a) (1979), that has no effect on the date the producer receives the money. Order 36 states that both the market administrator and handlers paying directly must pay no later than the same date. See id. §§ 1036.73(a)-(b), 1036.73(d). For example, payments for the first half of the month must be paid on or before the last day of the month no matter who pays the producer. Although the order permits a handler to pay before the due date, the plaintiffs introduced no evidence that handlers pay sooner than the market administrator. Thus there is no evidence that paying through the market administrator causes producers to receive their money later than with direct payment from the handler.
 
 
 19
 As to the first claimed injury loss of the right to demand payment from the handler the plaintiffs seem to mean that once the handler pays the money to the market administrator, producers must get their money solely from the government and that this in some way harms them. The plaintiffs suggest in their complaint that there is more of a risk of not getting the money because they have no control over the market administrator. At bottom, their basic complaint is that the government might mishandle the funds. Yet in an affidavit presented by the defendants, which the plaintiffs never tried to contest below, an official of the Department of Agriculture stated:
 
 
 20
 In the 40 years that the milk orders have been in operation, there has been no incident or allegation that market administrators have misappropriated or misused Producer-Settlement Fund monies, nor has there been any known loss of monies due to either producers or handlers from any market administrator under the various orders, as a result of carelessness or negligence.
 
 
 21
 Thus not only have the plaintiffs failed to produce evidence on this point, but also they have not contradicted the government's showing in the record.
 
 
 22
 As a second injury, the plaintiffs point to the loss of the right to sue to enforce payment. Yet neither in the district court nor in this court have they explained why this would occur. Order 36 no where says that it abrogates any cause of action a producer might have. The plaintiffs make a two-step argument in an attempt to surmount this difficulty: (1) once the handler pays the market administrator, UCC § 2-210, Pa.Stat.Ann. tit. 12A, § 2-210 (Purdon 1970), relieves the handler of liability (the theory being that performance is delegated to the market administrator); and (2) the producer cannot sue the market administrator.
 
 
 23
 The reliance on § 2-210 is misplaced because § 2-210(1) states: "No delegation of performance relieves the party delegating of any duty to perform or any liability for breach." Moreover, plaintiffs offer no theory as to why the market administrator would not be liable.
 
 
 24
 The third injury, loss of ability to sue on a handler's bond, was not presented in the complaints or affidavits. Moreover, there is no copy of such a bond in the record. Plaintiffs may not rely on a theory raised for the first time in this court.
 
 
 25
 Nor do the cases giving producers standing relied on by the plaintiffs and the district court help in this case. In all those decisions, the producer-plaintiff could show that the challenged order directly harmed him. For example, in Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), the Court held that producers have standing where the plaintiffs can show that the challenged order has the effect of giving the plaintiffs a lower price for their milk than that received by other producers. As already noted, order 36 has no effect on the price producers receive for their milk. Thus such cases had sufficient evidence of injury in the record to support a finding of standing.
 
 
 26
 Plaintiffs repeatedly asserted that under the liberalized standing rules a mere "trifle" of an injury is sufficient. While we express no view on whether the injuries claimed here would be sufficient, no case permits standing where the plaintiff fails to support the claim on the record after being afforded a full opportunity to do so. Because the plaintiffs failed to prove the alleged injuries, we hold they lacked standing to maintain this action.III.
 
 
 27
 The judgment of the district court will be reversed.
 
 
 28
 GIBBONS, Circuit Judge, concurring.
 
 
 29
 I join in the court's judgment reversing the order of the district court, but not in the majority opinion, which in my view serves only to add confusion to an already confused area of administrative law.
 
 
 30
 The plaintiff milk producers sought pre-enforcement judicial review of rulemaking by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937. 7 U.S.C. §§ 601-624 (1976) (the Act). They claim that the Secretary's regulations exceeded his legal authority, and affected them by altering the terms upon which they did business with their customers, the milk handlers. Surely these milk producers are within the zone of interest which the Agricultural Marketing Agreement Act protects. Compare Suntex Dairy v. Bergland, 591 F.2d 1063, 1067 (5th Cir. 1979) (producers are within zone of interest of the Act) With Rasmussen v. Hardin, 461 F.2d 595, 599-600 (9th Cir.), Cert. denied, 409 U.S. 933, 93 S.Ct. 229, 34 L.Ed.2d 188 (1972) (consumers are not within zone of interest of the Act). Certainly the allegation that a regulation mandates a change in the terms upon which these producers do business with their customers, the handlers, suffices to confer "standing," whatever that ambiguous term means, to seek judicial review of the legality of the Secretary's action. A mandated change in an existing legal relationship, or even in an existing competitive relationship, suffices to permit the person affected by the change to seek review of its legality. E. g., Investment Co. Inst. v. Camp, 401 U.S. 617, 620-21, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152-56, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).
 
 
 31
 The most confusing aspect of the majority's opinion is the suggestion that "no case permits standing where the plaintiff fails to support the claim on the record after being afforded (the) opportunity to do so." Majority Opinion 607 F.2d at 41. This confuses the preliminary inquiry as to whether a particular plaintiff will be given an opportunity to pursue a lawsuit with the question of the merits of his claim. If what the majority means is that having been given an opportunity to prove a claim for injunctive relief, the plaintiff failed to prove that claim, the decision should be predicated on the merits, rather than on a post-trial determination that he should not have been heard in the first place.
 
 
 32
 If the ordinary rules governing the injunctive remedy, including the need for a showing of irreparable harm, governed applications for injunctive relief against allegedly illegal administrative rulemaking, I would be inclined to agree that the plaintiffs have not shown the likelihood of imminent and irreparable injury, and thus would not be granted an injunction. In the context of this case, however, in which we review both a preliminary and a permanent injunction against an allegedly illegal rule, the appropriate test is impact, present or prospective, and illegality. The plaintiffs need not show that the operation of an illegal rule has already spilled their blood. Neither injunctive relief nor declaratory judgment, a remedy available under 28 U.S.C. § 2201 (1976), requires such a showing of immediate injury in the context of review of an allegedly illegal rule. See Abbott Laboratories v. Gardner, 387 U.S. 136, 152-54, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (requiring regulation aimed at petitioners, significant changes in business practices, exposure of petitioners to sanction).
 
 
 33
 Thus, although the majority is correct in pointing out that the plaintiffs have not shown any present economic harm from the operation of the rule, I would not reverse a judgment enjoining an illegal rule solely on that basis. Moreover, although the intervenor, Milk Marketing, Incorporated, contends that the lawsuit is contrived and that the plaintiffs are not the real parties in interest, the district court rejected their contention and the majority apparently does not dispute that ruling.
 
 
 34
 Turning to the merits, I vote to reverse because the district court erred in holding that the Secretary lacked authority to issue the challenged regulations.
 
 
 35
 Section 8c(5) of the Act provides in relevant part:
 
 
 36
 (5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) No others :
 
 
 37
 (A) . . . fixing, or providing a method for fixing . . . the time when payments shall be made, for milk purchased from producers or associations of producers. . . .
 
 
 38
 (E) Providing . . . (ii) for assurance of, and security for, the payment by handlers for milk purchased.
 
 
 39
 7 U.S.C. §§ 608c(5)(A), 608c(5)(E) (emphasis added). Section 8c(7)(D) provides:
 
 
 40
 (7) . . . orders shall contain one or more of the following terms and conditions:
 
 
 41
 (D) Incidental to, and Not inconsistent with, the terms and conditions specified in subsections (5) . . . and Necessary to effectuate the other provisions of such order.
 
 
 42
 Id. § 608c(7)(D) (emphasis added).
 
 
 43
 The challenged regulations change the time and method of payment to producers. The plaintiffs argue that the changes both conflict with and exceed the scope of the statute.
 
 
 44
 Section 8c(5) provides that orders, and by implication, regulations may contain only the provisions specified in subsections (A) through (G) or in subsection (7). See 7 U.S.C. § 608c(5) ("shall contain one or more of the following . . . and . . . no others"). The courts have construed this grant of authority narrowly. In the leading Supreme Court case of Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), the Court noted that
 
 
 45
 (t)he statute before us does not contain a mandate phrased in broad and permissive terms. . . . The prefatory discussion in the House Report emphasizes . . . the congressional purpose to confine the boundaries of the Secretary's delegated authority. In these circumstances an administrator does not have "broad dispensing power."
 
 
 46
 Id. at 183, 90 S.Ct. at 323 (affirming injunction against enforcement of alleged location differentials under section 8c(5)(B)); See H.R.Rep.No. 1241, 74th Cong., 1st Sess. 7-8 (1935).
 
 
 47
 The legislative history relied on in Zuber reveals Congress' intention to define narrowly the Secretary's powers in light of the then-recent decision in A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). The statute's "and . . . no others" language was included specifically for this narrowing purpose: "To eliminate questions of improper delegation of legislative authority raised by the decision in Schechter . . . the provisions . . . specify the terms which may be included in orders dealing with the enumerated commodities." S.Rep.No. 1011, 74th Cong., 1st Sess. 8 (1935); See H.R.Rep.No. 1241, 74th Cong., 1st Sess. 7-8 (1935). In interpreting the scope of the Secretary's authority under section 8c(5), the Supreme Court has consistently read the Act narrowly, in reliance upon the "and . . . no others" limitation. In Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952), for example, the Court invalidated deductions from a Producer's Settlement Fund for payments for services performed by cooperatives, reading 8c(5) narrowly. Id. at 456, 462-64, 72 S.Ct. 433 (payments not permitted by 8c(5) or 8c(7)(D)). In an earlier opinion, however, the Court, in upholding the constitutionality of the Act as amended, appeared to permit a broader reading of 8c(5). Cf. United States v. Rock Royal Coop., 307 U.S. 533, 546-47, 59 S.Ct. 993, 1000, 83 L.Ed. 1446 (1939) (§ 8c(5) orders may be promulgated when the Secretary "has reason to believe that . . . an order will tend to effectuate the declared policy of the Act").
 
 
 48
 Taking the most narrow reading of the Act, however, the challenged regulations are permitted under section 8c(5)(E)(ii). The purpose of the change in payment method was to alleviate the problem of chronic late payments to producers' cooperatives. 43 Fed.Reg. 33,656-57 (July 31, 1978). The Secretary's findings and conclusions, after outlining the nature and extent of the problem, noted that "the purpose of the adopted producer payment method is to Provide producers with greater assurances that they will be paid for their milk deliveries on a timely basis." Id. at 33,658 (emphasis added). Moreover, the effect of the regulations is to encourage prompt payment, thus bringing them squarely within sections 8c(5)(E)(ii) and 8c(7)(D). Therefore, the regulations are permissible and the injunction should be lifted.
 
 
 49
 Section 8c(7)(D) also supports the Secretary's action. A regulation that actually conflicts with a subsection of 8c(5) cannot be justified by the more general provisions of section 8c(7)(D). Lehigh Valley Coop. v. United States, 370 U.S. 76, 98, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) (invalidating compensatory payments to pool members for nonpool milk sales in region). In the absence of a direct conflict, "Considerable flexibility is provided by (section) 8c(7) (D), (but) it gives (an) opportunity only to include provisions auxiliary to those (specified in section 8c(5))" United States v. Rock Royal Coop., 307 U.S. 533, 575-76, 59 S.Ct. 993, 1014, 83 L.Ed. 1446 (1939); See Blair v. Freeman, 125 U.S.App.D.C. 207, 213, 370 F.2d 229, 235 (D.C.Cir.1966) (location differentials invalid under § 8c(5) are not validated by § 8c(7)(D)). In order for the Secretary to "fix . . . the time" of payments under section 8c(5)(A) and to give assurances and security for such payments as authorized by subsection 8c(5)(E)(ii), he has issued the contested payment regulations. They do not conflict with the terms of either subsection of 8c(5), and therefore the payment method selected by the Secretary is authorized either directly by section 8c(5), or derivatively under section 8c(7)(D) which permits regulations as "incidental" and "necessary" to the effectuation of the commands of section 8c(5).
 
 
 50
 I agree, therefore, that the preliminary and permanent injunction must be reversed.