**In re I.D. CRAIG SERVICE CORPORATION, Debtor,**

**Objection of Pittsburgh Steelers Sports, Inc. to Sale.**

**Bankruptcy No. 89–00640–JKF. Motion No. 90–6028M.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 31, 1992.

Charles E. Bobinis, and Owen W. Katz, Bernstein & Bernstein, P.C., Pittsburgh, Pa., for trustee Joseph J. Bernstein.

William Schorling, Klett, Lieber, Rooney & Schorling, Pittsburgh, Pa., for objector Pittsburgh Steelers Sports, Inc.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is the objection of Pittsburgh Steelers Sports, Inc.

(hereafter "Sports, Inc.") to a portion of the motion to sell filed by Joseph J. Bernstein, Trustee (hereafter Trustee). The motion involves the sale of Trustee's status as a season ticket holder which carries with it annual opportunities to acquire season tickets of the Pittsburgh Steelers Football Club's home games. There was no objection to the sale of the season tickets themselves and that portion of the sale is not at issue herein.

## INTRODUCTION [1]

■ What at the outset appeared to be a simple objection to sale has been complicated by the amorphous nature of the interest which Trustee sold. Season ticket holder status historically has included an automatic annual purchase offer and the right to transfer the status via a written request and payment of a five dollar transfer fee. This bundle of prerogatives is referred to, as it was at the sale, as "renewal rights". Despite the difficulty of defining its character, *all* interests of the debtor are estate property under 11 U.S.C. § 541, regardless of their nature, and, in any given case, the trustee must determine whether the interest has sufficient value to the estate to warrant a sale. *See* 11 U.S.C. § 541(d) (property to which debtor holds legal title is estate property to the extent of that title). *See also id.* at § 541(a) (the estate includes "*all* legal or equitable interests of the debtor in property") (emphasis added).

On August 16, 1990, shortly before the first home exhibition game, Trustee filed a motion to conduct an expedited sale of season tickets for the 1990–91 Pittsburgh Steelers home football games.[2] The motion was granted and the sale was conducted on August 28, 1990. Trustee sold fourteen tickets in six separate lots. Five lots

consisted of two seats each and one lot consisted of four seats. Trustee also moved to sell the renewal rights associated with each season ticket. Historically, season tickets to home games have been offered to the season ticket holder of record on an annual basis. Trustee's position is that this practice evidences the existence of rights in the holder to renew the season tickets. While it disputes Trustee's ability to sell the renewal rights, Sports, Inc. concedes that it permits season ticket holders to transfer their record status to any other person or entity upon written request and payment of a five dollar transfer fee.

Sports, Inc. objects to the sale of the renewal rights alleging that the sale violates the Pennsylvania anti-scalping law. *See* 4 P.S. § 201 et seq. Sports, Inc. also alleges that Trustee is precluded from selling the renewal rights because they constitute an executory contract which Trustee failed to assume within sixty days after the case was converted to chapter 7. *See* 11 U.S.C. § 365(d)(1) (prepetition executory contract regarding personalty deemed rejected in a chapter 7 if not assumed within sixty days after the order for relief). Sports, Inc. further maintains that within the past decade it instituted a policy to limit to one the number of transfers which season ticket holders are allowed to make from their accounts and, therefore, it is not required to honor Trustee's request to transfer the tickets from his name to those of the six buyers. However, based on the testimony and evidence adduced at trial as well as the briefs and arguments of the parties and the court's independent legal research, Sports, Inc.'s objections will be overruled and the sale of the tickets and the renewal rights will be confirmed to the successful bidders.[3]

---

1. Some of the recited facts were stipulated by the parties. Others are as found by the court. *See* Stipulation, Docket Entry 642 in conjunction with Trustee's Memorandum of Law in Opposition to the Objection, Docket Entry 635.

2. The tickets originally were in Debtor's name but the 1990 season tickets issued after this case was filed were in the name of the chapter 7 trustee "c/o Joseph Bernstein". *See* Deposition of Geraldine R. Glenn (hereafter Glenn Deposition), Vol. I, September 20, 1990, Exhibit 5. *See*

*also* Trustee's Memorandum of Law in Opposition to the Objection, Exhibit 10.

3. Harry Jones, president and majority shareholder of Debtor, objected to the sale by letter of August 20, 1990, on the ground that a motion to dismiss the bankruptcy petition was pending. The motion to dismiss was denied by separate opinion and order and so this objection is dismissed as moot. Jones also requested that Trustee be removed for various reasons but alleged no facts in support of his allegations and

## DISCUSSION

### Revocable License

Since 1933 Sports, Inc. has had season ticket holders. Its renewal policy has remained unchanged since 1972, according to the testimony of Daniel M. Rooney, President and Chief Executive Officer of Pittsburgh Steelers Sports, Inc. That is, it has offered its registered holders season tickets to Pittsburgh Steelers home football games annually and, as long as the holder of record continues to purchase season tickets, he retains the status. There is a waiting list for the opportunity to purchase.

There are 59,429 seats in Three Rivers Stadium in Pittsburgh, Pennsylvania, where the Steelers play their home games. Other seats include 1,200 box seats and the capacity of the Allegheny Club, a private facility, in which a section is set aside to provide ticket purchasing members the opportunity to watch the games from the comfort of the club. At the time of trial there were 55,000 season tickets issued representing approximately ninety-five per cent of the available seats. *See* Stipulation at ¶ 1(a). In addition, those on the waiting list have an opportunity to purchase a total of three thousand tickets to individual games. Deposition of Geraldine Glenn, Volume I, September 20, 1990, (hereafter Glenn Deposition, Vol. I) at 51–60. *See also* Stipulation at ¶ 1(b). Any tickets not sold in that manner are offered to the general public on May 21 of each year. *See* Stipulation at ¶ 1(b). The May 21 sale is publicly advertised by Sports, Inc. but it has not advertised any other ticket sales in the past eighteen years. Sports, Inc. has not licensed any independent person or agency to sell tickets and all are sold through its ticket office.[4] Approximately two thousand tickets are kept by Sports, Inc. to be distributed at management's discretion, to visiting teams, to Steeler personnel and players, or as complimentary passes.

Since at least 1977 all individual tickets, whether sold per game or in a season ticket package, contain identical printed information. Each contains, inter alia, the following limitation:

> This ticket is a revocable license and may be revoked and admission refused upon refunding the printed price thereon. This ticket may not be resold at a premium....

Memorandum in Support of the Objection of the Pittsburgh Steelers Sports, Inc., Exhibit B. Sports, Inc. argues that because each ticket alone is a revocable license, Sports, Inc. is not bound to offer the opportunity to buy season tickets in the future to the successful bidders at Trustee's sale.

The Steelers Season Ticket Holder Handbook (hereafter Handbook) is the only written document containing ticket policy about transfer and renewal. The Handbook is distributed to all season ticket holders. It has been in effect without change since 1982 and the same renewal policy has existed since 1972 in that every registered holder automatically receives an annual offer to purchase season tickets and receives the tickets upon payment of the purchase price.[5] The only reference which could be construed to refer to revocation of season ticket holder status is indirect, appears in the Handbook under the heading "Game Day", and provides that

> Rowdy and inconsiderate behavior such as: standing in the aisles and behind the

---

provided no basis for this request at the hearing on the sale. We are aware of no justification for the removal of Trustee and, therefore, this objection is dismissed as well. Jones further stated that "this Court should enter an automatic stay" until the propriety of the sale is resolved. The court declined to do so at the sale hearing.

**4.** The testimony established that Sports, Inc. recognizes that ticket holders sometimes resell particular game tickets and has no objection to and exercises no control over that secondary market. Although there was testimony regarding occasional efforts to police that market through responses to newspaper advertisements, these efforts have never disclosed information that caused Sports, Inc. to take action to halt the sales.

**5.** The sole exception to this practice involved Daniel Ofchinick, a convicted felon. The renewal offer was withdrawn based on a set of unique circumstances which are not applicable herein.

last row of seats, profane and/or abusive language in the Stadium is cause for ejection. *Repeated offenses can result in the loss of ticket privileges.* (Emphasis added).

Response of Trustee to the Objection, Exhibit 1.[6]

The testimony established one other instance which may lead Sports, Inc. to revoke the status. Sports, Inc.'s communications director, Joseph Gordon, testified that, although there is no premium payable for acquiring the status, all season ticket holders must buy the tickets to the home preseason games. Those fans who have balked at doing so have been threatened with the loss of their status. There was no other evidence or testimony proffered regarding revocation or termination of the right to retain season ticket holder status.

■ The fact that each ticket is a revocable license is not disputed. However, the conclusion does not follow that, because each single ticket is a revocable license, Sports, Inc. can either deny Trustee's request to transfer his season ticket holder status or refuse to recognize that status in his transferees. In the case law which Sports, Inc. argues is applicable, the revocable license concept has been applied in suits by ticket holders where, for example, events have been canceled or where the plaintiff's expected admission has been thwarted for some reason beyond management's control. *See, e.g., Bickett v. Buffalo Bills, Inc.,* 122 Misc.2d 880, 472 N.Y.S.2d 245 (Sup.Ct.1983) (baseball games canceled because of strike); *Horney v. Nixon,* 213 Pa. 20, 61 A. 1088 (1905) (fire commission ordered seats for which plaintiffs had tickets to be removed for safety reasons); *Miller v. Pittsburgh Athletic Co.,* 91 Pa.Super. 229 (1927) (orders for World Series tickets filled by lot). None of the cases cited are apposite to the termination of season ticket holder status. Furthermore, the cases and the testimony adduced in the

instant matter concerned only individual game admissions, not season ticket holder status renewal. The evidence established that, during the sixty year history of Sports, Inc., game admission has been refused, upon presentment of a ticket, only if the ticket was one which had been reported as lost or stolen or if the person seeking admittance behaved in a disruptive manner or had been observed buying the ticket from a scalper.[7] None of the cited events exist in this case and none concerned or are relevant to renewal rights.

The game tickets themselves and the right to renew the season tickets are two separate and distinct interests of this estate. This concept may be illustrated by analogy to the interest that the holder of a liquor license enjoys. Although, by statute in Pennsylvania, liquor licenses are privileges and not property, the rights attendant to the licenses are routinely sold and the licenses themselves transferred through sales in bankruptcy cases. *See* 47 Pa.Stat.Ann. § 4–468.

The United States Court of Appeals for the Third Circuit recently addressed the issue of renewal rights under a liquor license in *In re Nejberger,* 934 F.2d 1300 (3d Cir.1991). The court noted the value of liquor licenses in bankruptcy cases. *Id.* at 1302. *See also* 47 Pa.Stat.Ann. § 4–468(b.1). The court stated that they are within the broad definition of property enunciated by § 541 of the Bankruptcy Code and are property of the estate. 934 F.2d at 1302. *See* 11 U.S.C. § 541; 47 Pa.Stat.Ann. § 4–468. When the *Nejberger* bankruptcy was filed, the debtor's interest was limited. Simply stated, he had a renewal application pending with the Pennsylvania Liquor Control Board with the attendant opportunity to have that application considered by the Board. The Court of Appeals found that the Pennsylvania Liquor Code creates "an expectation that so long as a new license has not been

---

6. We need not decide whether "ticket privileges" include the opportunity to retain season ticket holder status because the described "repeated offenses" are not applicable to this case.

7. A scalper is someone who resells a ticket at a premium rather than at face value. No testimony or evidence was offered to illuminate the manner in which Sports, Inc. identifies a scalper by observation.

issued to fill a quota vacancy, the Board will consider the application for renewal." 934 F.2d at 1303. In *Nejberger* the debtor did not hold the renewal right as such but merely an expectation of the right to apply for renewal. *Id.*[8] Nonetheless, the court held that

> [t]he fact that [the] expectation is merely the right to apply for renewal does not prevent it from being a valuable interest which becomes part of the bankruptcy estate.

*Id.*[9]

We find that *Nejberger* is similar to this case and that the *Nejberger* analysis applies to the instant situation. Although liquor licenses are regulated and controlled by statute and, therefore, are distinguishable from the property interests at bar, the interest found by the Court of Appeals in *Nejberger* is the closest we have found in the reported case law to the instant one. Indeed, whereas in *Nejberger* the debtor's interest was merely the right to apply for renewal, in the case at hand the Trustee holds the right to receive the renewal opportunity by virtue of Sports, Inc.'s longstanding practice. In *Nejberger* the burden to reapply was on the debtor. Here, no burden to act was on Trustee. Rather, the solicitation to renew originates each year from Sports, Inc. On receipt, Trustee could let the opportunity to purchase pass or he could accept. Upon acceptance of the renewal offer by payment of the price requested, however, Trustee reacquired his status as season ticket holder for the year with the right to receive the solicitation to purchase the following season. When he reacquired his season ticket holder status he also retained his right to transfer that status by virtue of Sports, Inc.'s uniformly

applied policy of honoring such requests. By its conduct Sports, Inc. has created in season ticket holders, and, therefore, in this Trustee, an expectancy interest in the renewal rights which is as valuable as that in *Nejberger.*

With respect to season tickets, both renewal and transfer have always been automatic and routine. The expectancy interest in season ticket transfers and renewals has been created, fostered and honored by Sports, Inc. for many years. Even if *Nejberger* were not applicable to this case, the fact remains that the renewal rights attendant to the transferable season ticket holder status held by Trustee are valuable assets of this estate and subject to sale. The fact that the sale produced interested bidders willing to purchase the season ticket holder status with its associated renewal rights confirms that there is value. Value also is evidenced by the existence of a waiting list for season tickets because once registered holder status is achieved, it is automatically renewed as long as the holder pays for each year's season tickets and pre-season game tickets and takes no action to transfer the status to another. The renewal rights, therefore, are "appropriately considered property of the estate within the broad definition of section 541" of the Bankruptcy Code. *Id.* at 1302. Trustee, standing in the shoes of the Debtor, accepted Sports, Inc.'s solicitation to renew his season ticket holder status in early 1990 by paying for the season tickets. When he did so he retained all rights attendant to that status including (a) the right to receive the solicitation to purchase season tickets in the following season and (b) the right to transfer that status upon payment of the

---

**8.** The Liquor Control Board's renewal of the liquor license in *Nejberger* was contingent on the debtor's payment of taxes but the court noted that the prepetition tax obligation could not be used as a basis for denying the renewal. 934 F.2d at 1303. In the case at bar the right to receive the renewal offer in the following year is contingent on the payment of the current season's full ticket price and the purchase of the pre-season tickets in the current year. Those contingencies were satisfied.

**9.** Although the Liquor Control Board could exercise its discretion in reviewing a renewal ap-

plication, the Court of Appeals noted that because "a liquor license has value and is transferable ... the Board could issue a renewal license to the trustee who might request a transfer to a third party." *Id.* at 1303–04. In the case at bar Sports, Inc. has never refused a renewal or transfer of season ticket holder status except in the circumstances cited in text. No justification has been offered to bar Trustee in this liquidation from selling a valuable property interest of the estate.

five dollar transfer fee and submission of a written request to Sports, Inc. Under *Nejberger*, Trustee may transfer the rights attendant to his season ticket holder status as well as the tickets because the status includes the valuable expectancy interest of the renewal rights.[10] The Bankruptcy Code requires Trustee to examine estate assets and to determine their proper disposition. Having concluded that there was value in the season ticket holder status, i.e., the renewal rights, Trustee brought this motion to sell in an effort to maximize proceeds to be distributed to creditors. 11 U.S.C. § 704(1).[11]

### Transfer Policy

In addition to the principles enumerated in *Nejberger* the testimony and evidence in this case also militate in favor of the transfer of Trustee's season ticket holder status with its renewal rights. Since at least 1972, Sports, Inc. has effected transfer of renewal rights from one person or entity to another whenever the registered season ticket holder submits a written request. In the late 1970s the payment of a five dollar handling fee was introduced as an additional requirement. Upon receipt of the payment and the request, Sports, Inc. merely changes its records to reflect the new subscriber's name and address. Thereafter,

the annual solicitation is sent to the new registered holder.

The only departure from this practice occurred in 1979 when, in the course of financing the construction of additional seating for Three Rivers Stadium, Sports, Inc. entered into contracts with various entities or persons to "purchase" the new seats for six hundred dollars apiece. As an inducement to purchase, Sports, Inc. executed separate contracts with each purchaser for the use of the "purchased" seat for five years. *See* Deposition of Geraldine Glenn, Volume II, September 24, 1990, (hereafter Glenn Deposition, Vol. II) Exhibit 18. However, these contracts contained an express nonassignability clause. One of the purchasers was a company called Seal–Pac Controls, Inc., which later filed bankruptcy. In the Seal–Pac case an auction sale of the estate's season tickets to Steeler games was conducted in the bankruptcy court on a lump sum basis. Sports, Inc. thereafter effected a transfer on its season ticket holder register to the buyers. Despite the nonassignability clause, the renewal rights specified in the contracts were sold as well as the season tickets.[12] This is evidenced by letters of record which refer to transfer of accounts and all "right, title and interest" in the contracts. *See* Glenn Deposition, Vol. I, Exhibit 12. Sports, Inc. asserts that the sales are distinguishable in

---

10. Even if the season tickets were not in Trustee's name, he would have the right to exercise Debtor's option to transfer the tickets to third parties. *In re Nejberger*, 934 F.2d at 1304. Although *Nejberger* dealt with statutorily created expectancy interests, other cases discuss contractually created ones. *See, e.g., West American Insurance Co. v. Park*, 933 F.2d 1236, 1240 (3d Cir.1991) (equitable estoppel prohibits an insurer from using "the explicit language of an insurance policy to defeat the reasonable expectations of the insured.") The fact is that in this case the expectancy interest arose from the offer and acceptance of season tickets, the transfer policy expressed in the Handbook, and sixty years of practice.

11. Trustee in this chapter 7 case had four choices with respect to the season tickets. He could have done nothing when the tickets were offered for sale in which case the season ticket holder status would have expired and the tickets would have reverted to Sports, Inc. for nonpayment. Sports, Inc. then could have disposed of

them as it wished. Trustee's second option was to purchase the tickets and to sell only the tickets themselves. In this situation, following its practice, Sports, Inc. would have renewed the offer to Trustee to purchase the tickets in the next season at which time Trustee would have been faced with the same options. Trustee's third choice was to purchase the tickets, sell only the tickets and request the transfer from his name to those of the buyers without selling the renewal rights. Finally, Trustee could purchase the tickets, sell them *and* his renewal rights and then exercise the prerogative to transfer the tickets from his name to those of the buyers after the sale. Trustee exercised this last option in an effort to maximize the dividend to be paid to unsecured creditors. (There were no allegations that any liens exist against these assets.)

12. The evidence in the instant matter did not disclose the actual price paid but referred only to a "lump sum".

that Seal–Pac held the seats pursuant to a contract which included renewal rights. This argument is without merit inasmuch as the 1979 contract expressly prohibited assignment of the contracts or rights thereunder. *See* Glenn Deposition, Vol. II, Exhibit 18. Nonetheless, the sale was consummated without objection by Sports, Inc. The case at hand has no such obstacle to the sale of renewal rights.

### Equitable Estoppel

■ The doctrine of equitable estoppel is applied when a party intentionally "induces another to believe that certain facts exist and the other justifiably relies and acts upon such belief" and will be prejudiced if the first is permitted to contradict the expectations it has created. *Straup v. Times Herald*, 283 Pa.Super. 58, 71, 423 A.2d 713, 720 (1980) (petition for allowance of appeal denied 1981). The Superior Court of Pennsylvania explained the concept:

> Reduced to its essence, equitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct.

*Id.* *See also West American Insurance Company v. Park*, 933 F.2d 1236, 1240 (3d Cir.1991) (equitable estoppel applies to prohibit an insurer from using "the explicit language of an insurance policy to defeat the reasonable expectations of the insured.")

Over the past sixty years, Sports, Inc. intentionally created, encouraged and promoted the expectation that all season ticket holders of record will have the opportunity to renew their status on an annual basis and will be able to transfer that status upon written request and payment of a nominal transfer fee.

Sports, Inc. argues that to transfer the tickets from Trustee's name to the buyers' names would be unfair to those who have been on the waiting list for season tickets, some for as long as ten years. However, there was no evidence or testimony adduced at trial that these tickets actually would go to those on the waiting list if permitted to revert to Sports, Inc. To the contrary, the testimony was that, although approximately one hundred season ticket accounts lapse each year,[13] Glenn Deposition, Vol. I at 45, not all are offered to those on the waiting list. A minimum of fifty season tickets are withheld by Sports, Inc. to be distributed to others, in its unfettered discretion. Glenn Deposition, Vol. II at 25. Also, Sports, Inc. transfers registration on written request of season ticket holders of record to anyone, again bypassing the waiting list, without inquiring as to the nature of the transfer as between the ticket holders, i.e., sale, gift, devise, etc. Thus we perceive Sports, Inc.'s cry of "fans' rights" as a red herring.

■ Sports, Inc. attempts to advance alleged rights of third parties, i.e., members of the ticket buying public, including those on the season ticket waiting list. Neither the general public nor those on the waiting list could object to this sale inasmuch as their claim to the tickets would be tenuous at best in light of Sports, Inc.'s description, through the testimony of its witnesses and its exhibits, regarding its practices with respect to lapsed season tickets. Sports, Inc. admits that not all lapsed accounts are used to elevate those on the waiting list to season ticket holder status. Any harm these third parties might allege would be entirely hypothetical. Based on this record, they would not have standing to challenge the sale because there is no evidence of an "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Marchezak v. McKinley*, 607 F.2d 37, 39 (3d Cir.1979) citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978). *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Because the third parties have not become season ticket holders, they have acquired no rights to the season

13. Two to four tickets go to each name on the list. Glenn Deposition, Vol. II at 65.

tickets or to season ticket holder status. Sports, Inc. *a fortiori* lacks standing to assert their rights. *Cf., Bowman v. Wilson*, 672 F.2d 1145, 1152–53 (3d. Cir.1982) ("[f]or a person who himself can allege injury in fact" to raise another's constitutional rights there must be a close relationship between the two parties, the activity the litigant wants to pursue must "be inextricably bound up with the constitutional rights" of the other and there must be an obstacle to the third party asserting its rights).[14]

To prohibit Trustee from transferring his status as season ticket holder would not be likely to provide relief to Sports, Inc. or its fans inasmuch as the harm it seeks to prevent, i.e., interference with the waiting list, is perpetrated by Sports, Inc. itself through its failure to adhere strictly to the waiting list hierarchy. *See Marchezak v. McKinley*, 607 F.2d at 39 (the relief requested must be shown to prevent or redress the claimed injury). Furthermore, the transfer of season ticket holder status without interference or objection by Sports, Inc. is and has been common practice for many years. Sports, Inc. has promoted and facilitated easy transfers as a service to its customers and as a method of ensuring a sold-out stadium and replacement of fans. It is in Sports, Inc.'s interest to permit transfers as requested by customers inasmuch as it ensures that the tickets are purchased. The home games must be sold out if they are to be televised locally. Rooney testified that more than fifty percent of Sports, Inc.'s revenue comes from the television advertising aired during the football games.

Sports, Inc. offered evidence that other ball teams impose restrictions on, or prohibit outright, renewals or transfers. *See, e.g.*, Glenn Deposition, Vol. I, Exhibits 6, 11. This evidence apparently was intended to support its argument that it has the right to refuse Trustee's request for transfer or to refuse to offer the buyers season tickets in the future once the transfer is accomplished. However, the evidence is irrelevant and not dispositive because only Sports, Inc.'s practices and policies are at issue. The testimony and documents established that Sports, Inc.'s policies and practices are not the same as those of the other ball clubs. Sports, Inc.'s transfer policy, as written in the Handbook, is that "The season ticket holder of record may transfer ownership."[15] *See* Glenn Deposition, Vol. I, at 8.

The testimony established that all that is required to effect the transfer is a written request from the season ticket holder to Sports, Inc. and a five dollar transfer fee. Rooney explained that in the early 1980s a new policy was initiated to limit the number of transfers to one per year from any one account. Rooney testified that this policy was instituted because each season ticket holder wants "benefits" such as the Press and Radio Guide that Sports, Inc. distributes to season ticket holders. However, he testified that the main problem with multiple transfers is one of bookkeeping. Joseph Gordon, Sports, Inc.'s communications director, testified that this policy was initiated around 1980.[16] How-

---

**14.** Although *Bowman v. Wilson* addresses essentially the assertion of a constitutional right, the principles apply to statutory rights as well. *See*, 672 F.2d at 1152, n. 13.

**15.** The attorney for Sports, Inc. argued that Trustee's claim of "ownership" of season tickets was misplaced inasmuch as the Trustee culled the term from the imprecise speech of Geraldine Glenn during the course of her deposition. We do not credit this argument inasmuch as the Handbook which is distributed to all season ticket holders (1) refers twice to the holder of the tickets as the "owner" (2) contains a section captioned "SEASON TICKET OWNERSHIP" and (3) defines the season ticket holder as the "owner of season tickets". It also provides that

"season ticket holders of record may transfer ownership." Glenn Deposition, Vol. I, Exhibit 1. *See also id.* at Exhibit 15 (letter from Pittsburgh Steelers Ticket Office to John Markey stating, in pertinent part, "This account is registered under National Annealing Box Co. and cannot be changed without written authorization from the Owner and Corporate Officers indicating they give up the rights to said tickets and transfer ownership to you.")

**16.** Geraldine Glenn testified that requests for ticket transfers increased in 1983 because of a 1982 ballplayers' strike. Glenn Deposition, Vol. I, at 84. This testimony is not inconsistent with Joseph Gordon's testimony that the policy went into effect "around 1980".

ever, Gordon was quick to state that Sports, Inc. attempts to accommodate customers and that the policy is not enforced equally. He testified that there are few examples of record of a refusal to effectuate a requested transfer, none of which are based on the alleged "one transfer" policy. Transfers have been refused occasionally when the request was not made by the season ticket holder of record or when the transfer fee was not paid. Sports, Inc. accommodates its customers even when a transfer request arrives too late in the season. In that event the transfer is not executed but the requester is invited to reapply at the appropriate time. Glenn Deposition, Vol. I, Exhibit 18. These examples are contrary to and distinguishable from Sports, Inc.'s position in the instant case and clearly illustrate the policy of Sports, Inc. to effect transfers routinely and automatically.[17] The Handbook itself refers to the right to transfer season ticket holder status and contains no restrictions. *See* Response of Trustee to the Objection, Exhibit 1.

We conclude from the evidence and testimony that the limitation on transfers was intended to ease the bookkeeping function when the policy was instituted, but customer satisfaction was and is dominant and the policy has not been enforced since at least 1987. In addition, there was no testimony or evidence offered of Sports, Inc.'s insistence upon the one transfer rule. In fact, the testimony and evidence provided several examples of rather complicated transfers which were allowed. For example, in 1990 sixty season tickets were transferred from one account to seventeen accounts. Glenn Deposition, Vol. II, Exhibit 3. One month later another request, characterized by Sports, Inc. as "special", was honored to transfer eight of those same tickets to four more accounts. *Id.* at Exhibit 4. Furthermore, there was evidence of other trans-

fers which were not alleged to be "special cases", to-wit:

the transfer of 34 tickets from one account to fourteen accounts; (Glenn Deposition, Vol. II, Exhibit 5)

the transfer of six tickets from one account to three accounts; *Id.* at Exhibit 6)

the transfer of eight tickets from one account to three accounts; (*Id.* at Exhibit 7)

the transfer of sixteen tickets from one account to eight accounts; (*Id.* at Exhibit 8)

the transfer of sixteen tickets from one account to five accounts. (*Id.* at Exhibit 9).

Most of the transfers in evidence occurred between the years 1987 and 1990. These examples effectively rebut the testimony that since about 1980 Sports, Inc.'s policy has been to limit transfers from one account to only one other. Therefore, we find that, if such a restriction ever existed, it was abolished or has been ignored at least since 1987. No valid reason has been advanced by Sports, Inc. to justify a refusal to honor Trustee's transfer request.

### *The Anti-scalping Law*

Sports, Inc. maintains that this sale violates the anti-scalping law which prohibits the resale of

any tickets of admission, or any other evidence of the right of entry to any place of amusement, at a price higher than the established price fixed by the owners of such place of amusement, without having first obtained a license to so resell or engage in such business from the licensor ...

4 Pa.Stat. § 202.

It is not disputed that the tickets in this case have been sold for their face value and so the statute has not been violated with respect to that portion of the sale. The question remains whether the sale of

---

17. In addition to requests such as Trustee's, Geraldine Glenn's testimony established that transfer requests from decedents' estates are honored "routinely" and "historically". Glenn Deposition, Vol. II, at 16–17. Ms. Glenn's testimony also alludes to one incident in which a transfer was refused because a premium was to be paid

for the transfer. *See* Glenn Deposition, Vol. I, at 73–78 and Exhibits 13 and 14. However, the testimony and exhibits are entirely inconclusive in that no facts were stated and the nature of the transaction cannot be ascertained from the record.

Trustee's status as registered season ticket holder which encompasses the annual renewal of season tickets is subject to the statute and we conclude that it is not. The renewal opportunity is not "evidence of the right of entry to any place of amusement". 4 Pa.Stat. § 202. The individual tickets themselves are the only "evidence of the right of entry" and they were sold at face value. Season ticket holder status is evidence only of the right to receive the offer to purchase the season tickets from year to year. Thus, what Trustee actually is selling, although termed "renewal rights" throughout the course of these proceedings, is the "record title" to the status of registered season ticket holder which entails the entitlement to receive Sports, Inc.'s offer to purchase season tickets each year. *See* Handbook, *supra*.[18] For the foregoing reasons we find that the sale in the instant case does not violate the Pennsylvania anti-scalping law.

■ Trustee argues that he does not need to obtain a license because the statutory requirement that trustees adhere to all applicable laws applies only to those laws which concern health and safety.[19] Section 959(b) of Title 28, U.S.C., provides, in pertinent part, that

> ...a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

The majority view is that § 959 does not apply in chapter 7 cases where the trustee does not operate or manage a business but liquidates assets. *See, e.g., Matter of Borne Chemical Co., Inc.,* 54 B.R. 126, 135 (Bankr.D.N.J.1984). It is arguable that liquidation entails management but the cases that espouse this view are in the minority and frequently deal with public welfare. *See In re Wall and Tube Metal Products Co.,* 831 F.2d 118, 122 (6th Cir.1987) (whether trustee is reorganizing or liquidating is inconsequential especially in critical context of public welfare). The cases referring to public health and safety most often involve environmental issues and trustees have been precluded from abandoning contaminated assets when public health and safety might be endangered by such a course of action. *See, e.g., Midlantic National Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). We find unpersuasive the proposition that trustees need obey the law only when public health and safety are implicated but we need not decide in this case whether a chapter 7 trustee is bound by § 959 because we conclude that the sale of assets at issue does not violate the anti-scalping law.

■ Nonetheless, we are constrained to note that a trustee must follow the Bankruptcy Code in all respects, something which Trustee failed to do when he expended estate funds out of the ordinary course of business without court authority. *See* 11 U.S.C. § 363. In a chapter 7 liquidation, which was the state of this case when the balance was paid on the 1990 tickets, there was no operating business and it is impossible for the expenditure to

---

**18.** Trustee's sale of renewal rights in this case is akin to the practice of the University of Pittsburgh described by witness Joseph Gordon. The University imposes charges on its patrons over and above the ticket price for football game seats in prime locations. The extra amount is paid for the location of the seat and not for the right of entry to the stadium. The ticket holder thus holds two interests: the right to be admitted to the game, evidenced by the ticket, and the right to sit in a choice seat, for example, on the fifty yard line in row 2. In the instant case the right to admission to an individual game and the right to be offered a subscription to season tickets in the following year are separate interests.

**19.** Trustee also argues that tickets are often sold for a premium and cites newspaper advertisements placed by ticket holders seeking ticket buyers. *See* Respondent's Trial Exhibit 1. The advertisements are devoid of information that would tend to support this argument and we find no probative value in this evidence.

have been in the ordinary course.[20] Therefore, Trustee was required by § 363 to file a motion seeking court approval for the expenditure necessary to purchase the tickets. As a fiduciary he is required to adhere to the strictest letter of the law in all his dealings with respect to the estate. The facts established that Trustee purchased the tickets before filing this motion to sell so we cannot undo the error. Moreover, Trustee sold the tickets for face value and there is no economic harm to the estate other than any costs and fees associated with the instant litigation. To avoid diminution of the estate and to enforce the statutory mandates imposed upon estate fiduciaries the court will carefully scrutinize any request for Trustee's counsel fees, if one is made related to the sale of the renewal rights or the trial and briefing of this matter.

*Executory Contract*

 The unfortunate use of the term "renewal rights" rather than "record title" created a number of issues which otherwise may not exist. In addition to those already discussed, there remains Sports, Inc.'s contention that Trustee cannot sell the renewal rights because they represent an executory contract which Trustee did not move to assume within sixty days of his appointment as required by § 365. The bankruptcy was filed as a chapter 11 on March 13, 1989, and the Trustee was appointed ten days later. In a chapter 11 an executory contract of personalty must be assumed or rejected by the time a plan of reorganization is confirmed. Section 365(d)(1) requires assumption within sixty days of the conversion to chapter 7, a date which passed without assumption. However, we conclude that the failure to assume is not dispositive in that the asset at issue does not constitute a prepetition executory contract and, hence, § 365 is not applicable.

The most widely accepted definition of an executory contract is one under which the obligations of both parties "are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other". *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989) citing Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L.Rev. 439, 460 (1973). In the case at hand there is no substantial performance due by at least one side, i.e., Trustee. Once season ticket holder status is achieved by paying for season tickets, Sports, Inc. has an obligation to offer the holder the *opportunity* to purchase season tickets the following year, but the holder has no obligation to make the purchase. However, once it does, the offer and acceptance process is complete and the only obligation remaining is Sports, Inc.'s to offer the season tickets the following year. The absence of any obligation on behalf of the other party renders the contract nonexecutory. There is no further obligation on the part of the registered holder. Having accepted payment, Sports, Inc., by virtue of its own policies and the expectancy interest it created, must make the offer to purchase annually to its registered holders but, at that point in the process, there is no longer substantial performance due by *both* sides.[21] *Cf. Oxford Royal Mushroom Products, Inc.*, 45 B.R. 792 (Bankr.E.D.Pa. 1985) (a contract is not made executory when the only obligation remaining in the transaction is that of one side to pay money).

Furthermore, the evidence established that Trustee's season ticket holder status,

---

**20.** Section 721 of Title 11 permits the court to "authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." There was no authorization extant by the time Trustee bought the tickets and brought the sale. This case was converted from chapter 11 to chapter 7 on this Trustee's motion, Trustee having been appointed during the chapter 11 phase.

**21.** We express no opinion on the obligation, if any, (contractual or otherwise) of Sports, Inc. to offer season tickets to anyone. We find only that, based on Sports, Inc.'s prior practice, the expectancy interest created thereby and the offer in this case which has been accepted by this trustee, Sports, Inc. is obliged to honor Trustee's request to transfer his season ticket holder status to the buyers.

although in existence prepetition, was recreated postpetition by Sports, Inc. The offer and acceptance which gave rise to the matter under discussion both occurred postpetition. Section 365 governs assumption or rejection of *prepetition* executory contracts and is inapplicable to postpetition contracts. Moreover, as further indicia of whether there is an executory contract, we consider that one purpose of § 365 is to afford a party to a contract from which the estate will derive no benefit, and, hence, which it "rejects", the ability to participate as a claimant in any distribution to unsecured creditors. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, 866–78 (1988). The rejection of the provision at issue would afford no damage claim to Sports, Inc. because there is no obligation by any season ticket holder, including Trustee, to continue to retain that status.

### SUMMARY

We find that the season ticket holders' interest in season ticket renewal may be better termed an expectancy interest rather than a contractual interest. *See In re Nejberger, supra.* The expectancy interest has been created and fostered by Sports, Inc. in the public, including season ticket holders, by virtue of Sports, Inc.'s long practice of offering to renew season tickets to the current registered holder on an annual basis.[22] *See West American Insurance Co. v. Park, supra; Straup v. Times Herald, supra.* The Debtor's estate held that expectancy interest, as does Trustee at this juncture and, upon completion of the transfer formalities, so will the buyers. The ticket renewals encompassed in the expectancy interest have been shown to have value and are property of the estate under § 541 of the Bankruptcy Code. *In re Nejberger*, 934 F.2d at 1302. As such, the rights are subject to sale by Trustee. The knowledge that they will have the first opportunity to renew their seats next season is part of the inducement to fans to buy season tickets. Even if season ticket holders do not attend all games or the team has a losing season, they realize that next year's performance might be better and they will have the first opportunity to buy tickets which are in very high demand. This, in addition to the fact that only a few single Steeler game tickets may be available to the public at large in any given year, is at least part of the reason that season tickets with their renewal rights are in demand.[23] *See* page 493, *supra.* Because the sale of renewal rights is not the sale of evidence of admission to an event, the sale herein does not violate the Pennsylvania anti-scalping law.

Sports, Inc.'s offer to Trustee to purchase season tickets was not a qualified or limited offer. It was the same as every other offer made for the last sixty years to its season ticket holders.[24] No justification has been advanced for the application of a different procedure or principle where the interest to be sold has value for the estate.

**22.** Trustee argued that Sports, Inc. is bound to honor the transfer of renewal rights because a course of dealing has been established over the course of the past sixty years. A course of dealing has been defined as prior conduct between parties to a particular transaction which reasonably can be construed to establish an understanding. *H.R. Woolridge Co. v. Smith*, 5 Pa.D. & C.3d 230 (Clearfield Co., Pa.1978). The evidence does not disclose previous dealings between Sports, Inc. and the buyers, but the Debtor, and Trustee through the Debtor, was a season ticket holder for many years. Thus, Trustee legitimately expects to have his transfer request honored by Sports, Inc. and so it must be. The expectancy which Sports, Inc. created requires it to accord to Trustee the same treatment it has provided all other season ticket holders. Concerning expectancy rights of those on the waiting list, we note that if those on the waiting list have an expectancy interest at all, it is only to be offered an opportunity to buy season tickets when and if they become available and when and if Sports, Inc. so desires to make the offer. There is no expectancy as to the events which might lead to the availability of season tickets.

**23.** In addition to enabling it to receive revenue from television advertising during sold out games, the sale of season tickets means that Sports, Inc. has money in hand early on and does not have to wait game to game to determine if a sell-out exists.

**24.** The exception concerned the 1979 seat construction contracts.